IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONOVAN MCGEE,<br><br>individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>vs.<br><br>BARNES & NOBLE COLLEGE BOOKSELLERS, LLC; BARNES & NOBLE EDUCATION, INC.; CENGAGE LEARNING, INC.; FOLLETT HIGHER EDUCATION GROUP; MCGRAW HILL LLC; and PEARSON EDUCATION, INC.,<br><br>                    Defendants. | **CIVIL ACTION NO.**<br><br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Donovan McGee ("Plaintiff"), by and through his attorneys, brings this action on behalf of himself and all others similarly situated against the dominant publishers of college and graduate school textbooks, Cengage Learning, Inc. ("Cengage"), McGraw Hill, LLC (f/k/a McGraw-Hill Global Education Holdings, LLC) (collectively, "McGraw"), and Pearson Education, Inc. ("Pearson") (collectively, the "Publisher Defendants"), and the dominant retail chains operating on-campus college bookstores, Barnes & Noble College Booksellers, LLC, and Barnes & Noble Education, Inc. (collectively, "B&N"), and Follett Higher Education Group, Inc. ("Follett") (collectively with B&N, the "Retailer Defendants"), to stop Defendants' unlawful conduct in connection with "Inclusive Access" course material programs and obtain redress for Plaintiff and other persons injured by Defendants' conduct. Plaintiff alleges the following based

upon its personal knowledge and upon information and belief, including investigation conducted by its attorneys.

## **INTRODUCTION**

1.      The Publisher Defendants and the Retailer Defendants entered into the "Inclusive Access" conspiracy, described herein, for the purpose of monopolizing the market for sales of course materials in any courses and on any colleges in which the Inclusive Access policy applies. Inclusive access programs, which go by various names depending on the educational institution—for example, the "Digital Direct and Affordable Course Materials Initiative" ("Digital Direct") at the University of St. Thomas—require students to obtain course materials in an online-only format from their official on-campus bookstore, and not from another source, thereby preventing Defendants from facing competition from new print textbooks, used print textbooks, and other online sources, and from off-campus and online bookstores and sellers. Defendants' monopolization of the market for the sale of course materials in Inclusive Access courses has enabled Defendants to charge higher prices for those course materials without legitimate justification and to the detriment of college and graduate students.

2.      Inclusive Access programs increase the cost of course materials for students and eliminates their choice of where to obtain those course materials in order to increase the profits of textbook publishers and on-campus college bookstore retail chains. As a recent study by the United States Public Interest Research Group found, Inclusive Access programs "fail to deliver real savings to students, reduce faculty and student choice, and give even more power to a handful of big publishing companies."[1]

---

[1] https://uspirg.org/feature/usp/automatic-textbook-billing.

3.      The high cost of textbooks and course materials contributes to the rising costs of tuition and student loan debt in the United States. The College Board estimates that the average college student spends approximately $1,200 per year on textbooks and course materials.[2]

4.      Prior to Inclusive Access, college and graduate students had various options for obtaining textbooks, including from official on-campus bookstores, off-campus bookstores, mail order, online bookstores or sellers such as Amazon, Chegg, eBay, and Craigslist. Students were also able to purchase new print versions, used print versions, or electronic versions of textbooks. These various options of both sellers and formats increased competition, reduced prices, and saved students money. These same factors, however, resulted in decreased profits for the Defendants.

5.      Defendants entered into the Inclusive Access conspiracy in response to this decrease to their profits. Students enrolled in an Inclusive Access course are required to pay for electronic access to the textbook and/or course materials, at a designated price, through their own official on-campus bookstore. Students are billed for Inclusive Access textbooks and/or course materials automatically.

6.      Through Inclusive Access, the Publisher Defendants require every student enrolled in an Inclusive Access course to pay for electronic access to the course textbook, guaranteeing sales for the Publisher Defendants. Without Inclusive Access, many students would purchase a used version of the textbook from the secondary market, and the Publisher Defendants would not receive any money from those sales.

7.      Through Inclusive Access, the Retailer Defendants require students to purchase the course textbook from the Retailer Defendants' own on-campus bookstore. Without Inclusive

---

[2] https://research.collegeboard.org/trends/college-pricing/figures-tables/average-estimated-undergraduate-budgets-sector-2019-20.

Access, students would be able to buy print or electronic textbooks from competitors, and the Retailer Defendants would not receive any money from those sales.

8.      Inclusive Access materials are not available for purchase from any source other than official on-campus bookstores because the Publisher Defendants refuse to sell Inclusive Access materials to any other sources. The Publisher Defendants' exclusionary policy prevents competition from reducing prices and results in higher prices.

9.      Because the Publisher Defendants refuse to sell Inclusive Access materials to other sources, students effectively have no other choice than to purchase those materials from their official on-campus bookstore. The Inclusive Access materials include reading assignments, homework problems, and quizzes. Therefore, while students are technically given the option to "opt-out" of the purchase under federal law, doing so would put the student at a great disadvantage due to the inability to access the required course materials.

10.     Most colleges and graduate schools that use Inclusive Access automatically sign up students enrolled in Inclusive Access courses for the Inclusive Access materials and automatically charge the students for the Inclusive Access materials on their tuition bills.

11.     With Inclusive Access, students are forced to purchase electronic materials even if they prefer print. Through Inclusive Access, students receive access to electronic materials with an expiration date and are unable to save the course materials for future reference or sell them for money after the class is over. Instructors are required to spend valuable class time explaining how to use the online materials, and technical problems or broken internet connections can cause students to lose access to the materials needed for class.

12.     The Defendants' actions in conspiring to create Inclusive Access programs, requiring students to purchase Inclusive Access materials from only their official on-campus

bookstores, and refusing to sell Inclusive Access materials to other sellers—all taken so as to monopolize the market for textbooks and course materials in Inclusive Access classes and raise prices as a result—are actionable violations of federal antitrust laws. Plaintiff seeks treble damages and injunctive relief, and demands a trial by jury of all issues so triable, under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1, 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

13.     Plaintiff alleges the following based upon personal knowledge as to matters relating to himself and upon information and belief and based on the investigation of counsel as to all other matters:

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a).

15.     This Court has personal jurisdiction over Defendants B&N and Pearson because they have their principal places of business in, and transact substantial business in, New Jersey; Defendants Cengage, McGraw, and Follett because they all transact substantial business in New Jersey; Defendants Cengage, McGraw, and Follett all conspired with Defendants B&N and Pearson; and all Defendants committed acts in furtherance of the conspiracy in New Jersey.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to the claims occurred in this District and, alternatively, under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Defendants B&N and Pearson who are inhabitants of and transact business in this District.

## INTERSTATE COMMERCE

17.     Defendants' actions have had a significant effect on interstate commerce in the market for college textbooks.

18.     Defendant B&N operates on-campus college bookstores in 43 states and, upon information and belief, sells Inclusive Access textbooks and course materials to students in all of those 43 states.

19.     Defendant Follett operates on-campus college bookstores in 48 states and, upon information and belief, sells Inclusive Access textbooks and course materials to students in all of those 48 states.

20.     Defendants Cengage, McGraw, and Pearson sell textbooks and course materials through Inclusive Access programs to students in all 50 states.

21.     The Inclusive Access conspiracy described herein had a substantial effect on the national market for college textbooks, including the national market for college textbooks subject to Inclusive Access.

## PARTIES

22.     Plaintiff Donovan McGee is a resident of Saint Paul, Minnesota. During the relevant time period, Plaintiff was required to purchase and did purchase college textbooks through the "Digital Direct" program at the University of St. Thomas—an Inclusive Access program—directly from one or more of the Defendants.

23.     Defendant Barnes & Noble Education, Inc. is a Delaware corporation based in Basking Ridge, NJ that was spun off from Barnes & Noble, Inc. in 2015, and that is the parent company of Barnes & Noble College Booksellers, LLC.

24.     Defendant Barnes & Noble College Booksellers, LLC is a Delaware LLC based in Basking Ridge, NJ that operates Barnes & Noble's campus bookstores nationwide and that sells Inclusive Access materials through those bookstores.

6

25.     Defendant Follett Higher Education Group is an Illinois corporation based in Westchester, IL that operates Follett's campus bookstores nationwide and that sells Inclusive Access materials through those bookstores.

26.     Defendant Cengage Learning, Inc. is a Delaware corporation based in Boston, MA that publishes college textbooks and course materials, including through Inclusive Access.

27.     Defendant McGraw Hill LLC is a Delaware LLC based in New York, NY that publishes college textbooks and course materials, including through Inclusive Access.

28.     Defendant Pearson Education, Inc. is a Delaware corporation based in Upper Saddle River, NJ that publishes college textbooks and course materials, including through Inclusive Access.

## FACTUAL ALLEGATIONS

29.     Before the implementation of Inclusive Access programs, students were able to choose between print or electronic textbooks and course materials for their college and graduate school courses. This allowed students to use whichever method better suited their own learning style.

30.     Before Inclusive Access, students were able to purchase textbooks from a primary or secondary market—Students could purchase a new print or electronic textbook or a used one. Students who purchase print textbooks have the option of selling the print textbook after they are finished or to keep it for future reference.

31.     Before Inclusive Access, students were able to purchase textbooks from a variety of sources, such as official on-campus bookstores, off-campus bookstores, through mail order, and from online sellers such as Amazon, Chegg, eBay, and Craigslist.

32.     The Publisher Defendants control approximately 80–90% of the primary market for textbooks.

33.     The Retailer Defendants operate a majority of official on-campus bookstores in the United States. Nearly two-thirds of college and graduate students in the United States attend educational institutions where a Retailer Defendant operates the official on-campus bookstore.

34.     Competition exists in the retail market for textbooks used in courses that are not part of Inclusive Access, which includes on-campus bookstores, off-campus bookstores, out-of-state bookstores, and online bookstores and sellers. This competition forces competitors to reduce prices and improve service and selection in order to compete.

35.     The professor, the professor's department, and/or the college or graduate school ultimately makes the decision of which textbook will be used in any particular class. Students are required to buy that textbook in order to complete the necessary readings and assignments for a particular class.

36.     Publishers market their textbooks heavily to professors, departments, and universities.

37.     The Defendants formed and operated trade associations that furthered the conspiracies described herein.

38.     The Publisher Defendants formed the Educational Publishers Enforcement Group ("EPEG") in 2016. This group permitted the Publisher Defendants to communicate with each other in order to collude to impose Inclusive Access and pretextual anti-counterfeiting policies that served to restrict competition for textbooks. The Publisher Defendants have been members of the EPEG since it was first formed.

39.     The EPEG set forth its purported anti-counterfeiting practices called the EPEG Guidelines, which in reality served to limit the retailers permitted to sell textbooks. This limited the supply, creating a captive market and enabling the Publisher Defendants to charge higher

prices. The EPEG encouraged members to refuse to sell to retailers not on a "white list" of acceptable retailers, so as to limit competition from off-campus and online sellers.

40.    The Retailer Defendants participated in the National Association of College Stores ("NACS"), a trade association that formerly permitted any textbook retailers to join. Prior to April 1, 2019, the Publisher Defendants were able to, and did, participate in NACS events as non-voting members. The NACS voted to exclude retailers who did not operate on-campus bookstores on April 1, 2019. Thereafter, the NACS consisted of only the Retailer Defendants and college-operated bookstores. The April 1, 2019 vote enabled the NACS to act in furtherance of the conspiracy instead of a legitimate trade association representing all textbook retailers' interests.

41.    Prior to the Inclusive Access conspiracy, average annual spending on textbooks had decreased significantly as a result of students being able to purchase textbooks used or from off-campus bookstores or online bookstores or sellers. This competition reduced prices for students but decreased the Publisher Defendants' profits.

42.    This increased competition caused the Publisher Defendants and Retailer Defendants to experience a significant decrease in their profits.

43.    In response to the decreased profits, the Defendants created and implemented Inclusive Access to exclude competition and raise prices. Defendants' Inclusive Access scheme, as described herein, has allowed Defendants to stop the decline in profits resulting from increased competition and to increase their profits in the growing Inclusive Access market by monopolizing the market for Inclusive Access textbooks and charging supracompetitive prices for those Inclusive Access textbooks.

44.    With Inclusive Access, students who are enrolled in an Inclusive Access course receive access to an online version of the textbook and course materials. The students' access expires after the semester is over. The cost of the Inclusive Access textbook is often charged directly to the student's tuition bill, which can only be arranged through the official campus bookstore regardless of whether that bookstore is operated directly by the college or by a Retailer Defendant.

45.    Students are normally unable to purchase Inclusive Access textbooks from any other source, because the Publisher Defendants refuse to sell them to alternative sellers.

46.    Because students cannot obtain Inclusive Access textbooks from alternative sources, students are required to purchase the Inclusive Access materials from the official bookstore in order to complete necessary reading assignments and homework problems for the course.

47.    Commonly, students are automatically subscribed to, and billed on their tuition bills for, Inclusive Access materials due to their enrollment in an Inclusive Access course. While students technically have a legal right to "opt-out" of purchasing the Inclusive Access course materials, a student who opts out would not be able to complete required reading assignments and homework for a course because those materials are not available from other sources.

48.    Inclusive Access effectively excludes any competition for textbook purchases by eliminating the secondary market and alternative sources for students to purchase the Inclusive Access textbooks. The students are forced to purchase Inclusive Access materials from the Publisher Defendants and, except for campuses with college-operated bookstores, Retailer Defendants.

10

49.    Generally, on campuses where the official on-campus bookstore is run by a Retailer Defendant, Inclusive Access is an exclusive arrangement between the Publisher Defendants, Retailer Defendant, and university. These arrangements are set forth in license agreements between each Publisher Defendant, Retailer Defendant, and university, and provide that the Publisher Defendant will sell Inclusive Access materials at that university only through the Retailer Defendant operating the official on-campus bookstore. These license agreements are nearly identical to one another, demonstrating further the collusion by Defendants to impose the Inclusive Access program.

50.    Each Publisher Defendant and each Retailer Defendants have entered into direct exclusivity agreements which provide that the Publisher Defendant will not sell Inclusive Access materials to retailers other than the Retailer Defendant on the campuses where the Retailer Defendant operates. These agreements have allowed for rapid expansion of the Inclusive Access system by not requiring a formal license agreement to be entered into with each university.

51.    On campuses where the official on-campus bookstore is run by the university itself, Inclusive Access is an exclusive arrangement between the Publisher Defendants and the university.

52.    When a college first adopts Inclusive Access, it normally begins with a few courses as a trial, but then expands to far more courses and students, starting with the introductory-level courses with the largest enrollments.

53.    When retailers other than the Retailer Defendants or on-campus bookstores run by universities have approached the Publisher Defendants and asked to purchase Inclusive Access materials to sell to students, they were refused.  The Publisher Defendants either stated that they had an exclusive arrangement with the Retailer Defendant or college-run on-campus store, or

that the Inclusive Access materials could not be made available in a format that would allow those off-campus or online retailers to resell them.

54.     The Publisher Defendants refused to sell Inclusive Access materials to off-campus retailers in numerous college communities, including retailers near Dona Ana Community College, Eastern Kentucky University, the University of New Mexico, New Mexico State University, the University of North Texas, and the University of Texas Arlington that sought to sell Inclusive Access materials for those colleges.

55.     In the instances where the Publisher Defendants did sell Inclusive Access materials to off-campus retailers, Publisher Defendants did so at a substantially higher price than to the Retailer Defendants or to college-run on-campus bookstores. As a result, off-campus retailers are unable to sell the materials at a competitive price and are unable to compete for sales.

56.     The Publisher Defendants and Retailer Defendants claim that Inclusive Access has technological advantages, but in reality, it simply offers the same textbooks and course materials that were offered before, but in a restricted electronic-only format, and with time-limited access. In addition to being more expensive, it also does not allow students who learn better from a print format to use print. Students also cannot keep the materials for future reference, to help them in future classes and in their careers. In STEM fields especially, upper-level classes often build on the knowledge gained in lower-level classes, and students may often need to refer back to earlier material to fully understand the new material.

57.     Inclusive Access can require professors to spend class time explaining how to use the system, and students can be cut off from the materials when there are technical problems or when they don't have Internet access, both problems that don't exist with standard textbooks.

58.    The Tennessee Board of Regents compared student performance before and after the use of Inclusive Access and found that the percentage of students who obtained a grade of at least "C" actually declined in a majority of courses after switching to Inclusive Access.

59.    The Publisher Defendants have justified Inclusive Access by claiming that the cost to students is lower than the list price, but the Publisher Defendants set the list price and can artificially inflate that list price to make it appear that Inclusive Access is sold to students at a bargain. The cost of Inclusive Access is higher than the price would be if open competition existed.

60.    Digital versions of books incur lower production costs than physical versions. If open competition existed, the cost of electronic textbooks would be lower still.

61.    Michael Hansen, the CEO of Defendant Cengage, agreed in an interview that the goal of Inclusive Access is to eliminate the used bookstore market. Nana Banerjee, the CEO of Defendant McGraw-Hill, stated in an interview that Inclusive Access intended to take out the used secondary textbook market.

## RELEVANT MARKET

62.    The relevant product market for the purposes of the antitrust claims in this action, to the extent Plaintiff's claims require the definition of a relevant market, is the market for textbooks and course materials for courses subject to Inclusive Access (the "Inclusive Access Market").

63.    Upon information and belief, the Publisher Defendants have a market share of over 90% of the Inclusive Access Market.

64.    The Inclusive Access Market is a product market consisting of only Inclusive Access textbooks and course materials. There are no substitutes for Inclusive Access textbooks and course materials. Availability of new or used textbooks does not constrain Inclusive Access

prices because students cannot use those new or used textbooks as an alternative to Inclusive Access textbooks. Inclusive Access textbooks can only be purchased from official on-campus retailers, and are generally not available from any other seller. The isolated availability of Inclusive Access textbooks from other sources does not constrain the price of Inclusive Access textbooks from official on-campus retailers.

65.     At all relevant times, the Publisher Defendants had substantial market power in the Inclusive Access Market, the power to maintain the price of Inclusive Access materials at supracompetitive levels, and the power to do so profitably without losing substantial sales.

66.     The Retailer Defendants control 50% of the market share in official on-campus bookstores and serve nearly two-thirds of the college and graduate students in the nation. The Retailer Defendants, therefore, have a large market share in the overall Inclusive Access Market.

67.     The Inclusive Access Market is susceptible to collusion because of the small number of dominant publishers, the on-campus bookstores' monopoly position, the captive market of students who need the Inclusive Access textbooks to complete course assignments, and high barriers to entry to due the Defendants' longstanding relationships with textbook authors and the professors and universities that make textbook selections.

68.     Unless the Defendants' are enjoined from continuing their activities in furtherance of the Inclusive Access conspiracy, the Inclusive Access Market is likely to grow to represent a larger portion of all college textbook and course material sales, resulting in higher prices and reduced choice for more students, in more courses, and at more colleges and graduate schools.

## **ANTITRUST INJURY**

69.     Defendants' anticompetitive conduct has had the following effects, among others:

a.      At colleges with bookstores operated by Retailer Defendants, Plaintiff and Class members have been forced to purchase Inclusive Access textbooks from only the Retailer Defendants;

b.      At colleges with college-operated bookstores, Plaintiff and Class members have been forced to purchase Inclusive Access textbooks from only the official college-operated bookstore; and

c.      Price competition has been restrained or eliminated with respect to Inclusive Access textbooks.

70.     The purpose of the Defendants' conspiratorial conduct was to raise, fix, or maintain the prices of Inclusive Access textbooks and, as a direct and foreseeable result, Plaintiff and Class members paid supracompetitive prices for Inclusive Access materials.

71.     Plaintiff and Class members have sustained injury by virtue of having paid higher prices for Inclusive Access textbooks than they would have paid in the absence of Defendants' unlawful conspiracy, and have suffered damages as a result.

72.     This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## **FRAUDULENT CONCEALMENT**

73.     The Defendants engaged in a secret conspiracy. The Defendants concealed the Inclusive Access conspiracy from Plaintiff and Class members, because their actions developing and implementing the Inclusive Access conspiracy took place in private communications, such as through trade associations that purported to have purposes other than the Inclusive Access conspiracy. The Defendants' publicly promoted Inclusive Access as being technologically advanced, cheaper, or in response to consumer demand, and not for the true purpose of raising prices and increasing profits by eliminating competition.

74.    Plaintiff and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint.

75.    By virtue of the fraudulent concealment of Defendants' wrongful conduct, the running of any statute of limitations should be deemed tolled and suspended with respect to Plaintiff's and Class members' claims as a result of the unlawful conspiracy alleged herein.

## CLASS ACTION ALLEGATIONS

76.    Plaintiff brings this action on behalf of himself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3), on behalf of the following Class:

> All students at colleges or graduate schools in the United States who were required to purchase textbooks or course materials through Inclusive Access.

77.    Excluded from the Class are the Defendants, including any interest in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants, and their employees.

78.    **Numerosity**. The members of the Class are so numerous that joinder of all members of any class would be impracticable. The Class members are ascertainable from records in the possession or control of Defendants, including records of the students who were required to purchase textbooks and course materials pursuant to enrollment in an Inclusive Access course.

79.    **Commonality**. There are questions of law and fact common to the Class, including but not limited to the following:

a.    Whether the Defendants colluded to create, promote, and maintain the Inclusive Access programs;

b.      Whether the Publisher Defendants colluded with college-operated campus bookstores to create, promote, and maintain the Inclusive Access programs at those institutions;

c.      Whether the Publisher Defendants colluded amongst themselves to fix and raise the price of textbooks and course materials under the Inclusive Access program;

d.      Whether the Publisher Defendants refused to deal with independent retailers and sellers who sought to sell Inclusive Access textbooks and course materials;

e.      The time period, the number of colleges and graduate schools, and the number of students affected by the Inclusive Access programs;

f.      Whether the Publisher Defendants had market power in the market for college textbooks and course materials subject to Inclusive Access;

g.      Whether the Publisher Defendants substantially foreclosed competition in the market for college textbooks and course materials subject to Inclusive Access;

h.      Whether the Retailer Defendants had monopoly power in the market for college textbooks and course materials subject to Inclusive Access on campuses which they operate official on-campus bookstores;

i.      Whether Inclusive Access programs have a legitimate pro-competitive justification;

j.      Whether Plaintiff and the Class suffered injury as a result of the Defendants' actions, and if so, the extent of those damages;

k.    Whether the conduct alleged herein has artificially maintained, preserved, or enhanced the Publisher Defendants' market power in the market for college textbooks and course materials subject to Inclusive Access;

l.    Whether the conduct alleged herein has artificially maintained, preserved, or enhanced the Retailer Defendants' monopoly power in the market for college textbooks and course materials subject to Inclusive Access on campuses which they operate official on-campus bookstores;

m.    Whether the actions of the Publisher Defendants, as alleged herein, constitute a violation of the Sherman Act;

n.    Whether the actions of the Retailer Defendants, as alleged herein, constitute a violation of the Sherman Act;

o.    The operative time period and extent of Defendants' antitrust violations;

p.    The appropriate injunctive and equitable relief for the Class; and

q.    The appropriate measure of damages for the Class.

80.    **Typicality**. Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, Plaintiff and the other Class members were injured through the substantially uniform misconduct by Defendants. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and members of other classes arise from the same operative facts and are based on the same legal theories.

81.    **Adequacy of Representation**. Plaintiff is an adequate representative of the Class because its interests do not conflict with the interests of the other Class members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action

litigation and Plaintiff will prosecute this action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiff and their counsel.

82.    **Superiority**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

83.    Further, Defendants have acted or failed to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regards to the members of the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## CLAIMS FOR RELIEF

### COUNT ONE
### Unlawful Agreement to Restrain Trade (15 U.S.C. § 1)

84.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

85.    Defendants conspired to restrain trade by (1) developing and implementing Inclusive Access through agreements with colleges and graduate schools which mandated students buy textbooks and/or course materials through Inclusive Access; and (2) by destroying the secondary market for Inclusive Access textbooks and course materials by colluding to restrict the ability of non-conspirators to sell or resell Inclusive Access textbooks and course materials.

86.    Defendants' Inclusive Access conspiracy was successful in creating a captive market for Inclusive Access textbooks and course materials and eliminating competition, thereby allowing Defendants to raise prices without losing demand. Plaintiff and Class members were subsequently injured by Defendants' conduct, as they were forced to pay supracompetitive prices because no reasonable alternative for Inclusive Access textbooks and course materials existed.

87.    Plaintiff and Class members also seek an injunction against Defendants under § 16 of the Clayton Act preventing and restraining Defendants from engaging in the violations alleged herein.

## COUNT TWO
### Monopolization (15 U.S.C. § 2)

88.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

89.    The Publisher Defendants have monopoly power in the market for Inclusive Access textbooks and course materials at each individual university that uses Inclusive Access, and acquired that power willfully through the conspiracy described herein rather than through any technological advantages from, or consumer demand for, Inclusive Access.

90.    The Retailer Defendants have monopoly power in the market for Inclusive Access textbooks and course materials at universities where they operate the official on-campus

20

bookstore, and acquired that power willfully through the conspiracy described herein rather than through any technological advantages from, or consumer demand for, Inclusive Access.

91.    The Defendants acquired their monopoly power through anticompetitive and exclusionary means, by (1) developing and implementing Inclusive Access through agreements with colleges and graduate schools which mandated students buy textbooks and/or course materials through Inclusive Access; and (2) by destroying the secondary market for Inclusive Access textbooks and course materials by colluding to restrict the ability of non-conspirators to sell or resell Inclusive Access textbooks and course materials.

92.    The Defendants' actions have served to create and maintain their monopoly for Inclusive Access textbooks and course materials at each university, in violation of 15 U.S.C. § 2.

93.    The Defendants' violation of 15 U.S.C. § 2 has caused Plaintiff and Class members injury by forcing them to pay higher prices for textbooks and course materials than they would pay in a competitive market in the absence of Defendants' anticompetitive practices alleged herein.

94.    Plaintiff and Class members also seek an injunction against Defendants under § 16 of the Clayton Act preventing and restraining the Defendants from engaging in the violations alleged herein.

## COUNT THREE
### Attempted Monopolization (15 U.S.C. § 2)

95.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

96.    The Publisher Defendants engaged in predatory and anticompetitive conduct with the specific intent of monopolizing the market for Inclusive Access textbooks and course

materials at each individual university that uses Inclusive Access and with a dangerous probability of monopolizing that market.

97.    The Retailer Defendants engaged in predatory and anticompetitive conduct with the specific intent of monopolizing the market for Inclusive Access textbooks and course materials at universities where they operate the official on-campus bookstore, and with a dangerous probability of monopolizing that market.

98.    The Defendants engaged in anticompetitive and exclusionary conduct with the specific intent of monopolizing the market by (1) developing and implementing Inclusive Access through agreements with colleges and graduate schools which mandated students buy textbooks and/or course materials through Inclusive Access; and (2) by destroying the secondary market for Inclusive Access textbooks and course materials by colluding to restrict the ability of non-conspirators to sell or resell Inclusive Access textbooks and course materials.

99.    There is a dangerous probability that the Defendants' conduct will in fact monopolize the market for Inclusive Access textbooks because their conduct has excluded all competition.

100.    Defendants' actions are attempted monopolization of the market for Inclusive Access textbooks and course materials in violation of 15 U.S.C. § 2.

101.    The Defendants' violation of 15 U.S.C. § 2 has caused Plaintiff and Class members injury by forcing them to pay higher prices for textbooks and course materials than they would pay in a competitive market in the absence of Defendants' anticompetitive practices alleged herein.

102.    Plaintiff and Class members also seek an injunction against Defendants under § 16 of the Clayton Act preventing and restraining the Defendants from engaging in the violations alleged herein.

## COUNT FOUR
### Conspiracy to Monopolize (15 U.S.C. § 2)

103.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

104.    Defendants conspired to restrain trade by (1) developing and implementing Inclusive Access through agreements with colleges and graduate schools which mandated students buy textbooks and/or course materials through Inclusive Access; and (2) by destroying the secondary market for Inclusive Access textbooks and course materials by colluding to restrict the ability of non-conspirators to sell or resell Inclusive Access textbooks and course materials.

105.    Defendants committed overt acts in furtherance of the Inclusive Access conspiracy alleged herein, including entering into exclusivity agreements between Defendants, between Defendants and universities, and between Publisher Defendants and universities.

106.    Defendants' actions are a conspiracy to monopolize the market for Inclusive Access textbooks and course materials at each university, in violation of 15 U.S.C. § 2.

107.    Defendants' conspiracy to monopolize the market for Inclusive Access textbooks and course materials in violation of 15 U.S.C. § 2 has caused Plaintiff and Class members injury by forcing them to pay higher prices for textbooks and course materials than they would pay in a competitive market in the absence of Defendants' anticompetitive practices alleged herein.

108.    Plaintiff and Class members also seek an injunction against Defendants under § 16 of the Clayton Act preventing and restraining the Defendants from engaging in the violations alleged herein.

## PRAYER FOR RELIEF

109.    WHEREFORE, Plaintiff and Class members hereby respectfully request that:

a.      The Court determine the federal antitrust claims alleged herein may be maintained as a class action under Fed. R. Civ. P. 23;

b.      The Court appoint Plaintiff as the representative of the Class, and his counsel of record as counsel for the Class;

c.      The Court award, pursuant to 15 U.S.C. § 15, compensatory and trebled damages to the Class resulting from Defendants' violations of the Sherman Act;

d.      The Court order, pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Defendants from continuing their unlawful acts in violation of the Sherman Act;

e.      The Plaintiff and Class be awarded their costs, expenses, and reasonable attorney's fees in bringing this action;

f.      The Plaintiff and Class be awarded pre-judgment and post-judgment interest on all sums awarded; and

g.      Such other and further relief as this Court may deem just and proper.


## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: June 3, 2020                    */s/ Simon B. Paris*
                                       Simon B. Paris, Esq.
                                       Patrick Howard, Esq.
                                       Charles J. Kocher, Esq.
                                       **SALTZ, MONGELUZZI,**
                                       **& BENDESKY, P.C.**
                                       1650 Market Street, 52nd Floor
                                       Philadelphia, PA 19103

Tel: (215) 496-8282
Fax: (215) 496-0999
sparis@smbb.com
phoward@smbb.com
ckocher@smbb.com

Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
Mickey L. Stevens
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com
mstevens@gustafsongluek.com

Brett Cebulash
Kevin Landau
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, New York 10038
Tel: (646) 873-7654
Fax: (212) 931-0703
bcebulash@tcllaw.com
klandau@tcllaw.com

Dianne M Nast
Daniel N. Gallucci
Joseph N Roda
**NastLaw LLC**
11001 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Tel: (215) 923 9300
Fax: (215) 923 9302
dnast@nastlaw.com
dgallucci@nastlaw.com
jnroda@nastlaw.com

*Attorneys for Plaintiff*